**THOMAS RIGGING & CONSTRUCTION COMPANY, INC., a Pennsylvania corporation, t/d/b/a Thomas Technologies, Benjamin F. Thomas, Wayne Dash, and Pauline Doorley, as the executrix of the Estate of Richard B. Doorley, Deceased, Appellees/Cross–Appellants**

v.

**CONTRAVES, INC., a Pennsylvania corporation, Appellant/Cross–Appellee.**

Superior Court of Pennsylvania.

Argued Dec. 5, 2001.

Filed May 3, 2002.

---

**2.** *See, e.g., Morgan v. MacPhail,* 550 Pa. 202, 211–12, 704 A.2d 617, 622 (1997) (Nigro, J., dissenting); *Hoffman v. Brandywine Hospital,* 443 Pa.Super. 245, 256, 661 A.2d 397, 402 (1995) (Beck, J., concurring); *Stover v. Association of Thoracic and Cardiovascular Surgeons,* 431 Pa.Super. 11, 26 n. 6, 635 A.2d 1047, 1054 n. 6 (1993); *Wu v. Spence,* 413 Pa.Super. 352, 355–57, 605 A.2d 395, 396–97 (1992); *Malloy v. Shanahan,* 280 Pa.Super. 440, 444–50, 421 A.2d 803, 805–08 (1980) (Hoffman, J., dissenting).

**3.** *See* Medical Care Availability and Reduction of Error (MCARE) Act, Act No. 2002–13, H.B. No. 1802, approved March 20, 2002 (codified as amended at 40 P.S. §§ 1303.101–1303.748 (Supp.2002)); Act of Nov. 26, 1996, P.L. 776, No. 135, § 10 (as amended, 40 P.S. § 1301.811–A) (repealed and recodified as amended at 40 P.S. § 1303.504).

Richard K. Dandrea, Pittsburgh, for Contraves, Inc.

Richard F. Rinaldo, Pittsburgh, for Doorley.

Before: HUDOCK, MUSMANNO, and TODD, JJ.

TODD, J.

¶ 1 In these consolidated cross-appeals, Contraves, Inc. appeals the judgment entered in favor of the plaintiffs below, Thomas Rigging & Construction Company, Inc., t/d/b/a Thomas Technologies, Benjamin F. Thomas, Wayne Dash, and Pauline Doorley, as the executrix of the estate of Richard B. Doorley (collectively, "Licensors"), in their suit for royalty fees allegedly due under their license agreement with Contraves, and Licensors in turn appeal the trial court's denial of

their claim for counsel fees.[1] We reverse in part, affirm in part, and remand.

¶ 2 This case concerns a dispute over royalty payments allegedly due under an exclusive license agreement for the manufacture and sale of rail yard snowblowers which employ a "microjet" engine invented by Richard B. Doorley, now deceased. In October 1997, Contraves entered into this multi-year license agreement with Licensors (including Doorley). The license agreement provided for royalty payments by Contraves to Licensors based on the number of engines and snowblowers sold by Contraves. At issue in the present litigation was whether the agreement required yearly minimum payments of $75,000 in the first year and $100,000 in subsequent years. The agreement further provided for a minimum payment of $1,260,000 to Licensors after the first three years, and a similar payment of $2,800,000 after seven years, to avoid automatic termination of the agreement.

¶ 3 Contraves did not make any snowblower sales the first year of the agreement and Licensors brought suit in November 1998 when Contraves refused to make a $75,000 minimum payment which Licensors alleged was due. In year two, Contraves made royalty payments of $38,000 based on its actual sales, but did not make the allegedly-required minimum payment of $100,000. In response to Licensor's suit, Contraves argued, *inter alia*, that the minimum payments of $75,000 after year one, and $100,000 at the end of years two and three were optional, and filed a motion for summary judgment to that effect. The Honorable Judith L.A. Friedman denied this motion but *sua sponte* granted summary judgment to Licensors for $251,687.84, concluding that certain minimum payments were required under the license agreement. Licensors' additional claim for the three-year payment of $1,260,000, and their claim for counsel fees under the agreement, were tried before the Honorable Max Baer, who denied the claims. Post-trial motions were denied, and this timely appeal followed.

¶ 4 In its appeal, Contraves asserts that the trial court erred in finding that the license agreement mandated certain minimum payments by Contraves. In their cross-appeal, Licensors argue that the trial court erred in rejecting their claim for counsel fees.

¶ 5 Our role in the interpretation of a contract is well settled:

Determining the intention of the parties is a paramount consideration in the interpretation of any contract. *Robert F. Felte, Inc. v. White*, 451 Pa. 137, 143, 302 A.2d 347, 351 (1973); *Unit Vending Corp. v. Lacas*, 410 Pa. 614, 617, 190 A.2d 298, 300 (1963). The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. *Stewart v. McChesney*, 498 Pa. 45, 48–49, 444 A.2d 659, 661 (1982); *In re Estate of Breyer*, 475 Pa. 108, 115, 379 A.2d 1305, 1309 (1977). However, as this Court stated in *Herr Estate*, 400 Pa. 90, 161 A.2d 32 (1960), "where an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by

---

1. We note that in their briefs to this Court, the parties indicate that they are appealing various pre-judgment orders. An appeal to this Court properly lies from a judgment entered subsequent to the trial court's disposition of any summary judgment motions or post-trial motions. *See Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 441 Pa.Super. 281, 287, 657 A.2d 511, 514 (1995). Therefore, these appeals properly lie from the judgment entered April 30, 2001.

extrinsic or collateral circumstances." *Id.* at 94, 161 A.2d at 34.

We first analyze the lease to determine whether an ambiguity exists requiring the use of extrinsic evidence. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Metzger v. Clifford Realty Corp.*, 327 Pa.Superior Ct. 377, 386, 476 A.2d 1, 5 (1984); *Commonwealth State Highway and Bridge Authority v. E.J. Albrecht Co.*, 59 Pa.Commonwealth Ct. 246, 251, 430 A.2d 328, 330 (1981). *See also* Black's Law Dictionary 73 (Rev. 5th ed.1979). The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact. *Easton v. Washington County Insurance Co.*, 391 Pa. 28, 137 A.2d 332 (1957); *Fischer & Porter Co. v. Porter*, 364 Pa. 495, 72 A.2d 98 (1950). *See generally* 4 Williston on Contracts § 616 (3d ed.1961).

*Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 200–01, 519 A.2d 385, 389–90 (1986).

▮ ¶ 6 Contraves asserts on appeal that the trial court erred in awarding Licensors approximately $251,000 in minimum royalty payments, claiming instead that the license agreement does not require *any* minimum payments. (No one disputes that Contraves properly paid $38,000 in per-unit royalty payments, based on its actual sales, under articles 4.1 and 4.2 of the agreement.) Specifically, Contraves asserts that under article 4.3.1 of the agreement, the provision at issue, it was not required to pay the minimum royalty payments of $75,000 after the first year, and $100,000 after subsequent years. Article 4.3.1 reads in full as follows:

4.3.1 *Minimum Payment Per License Year. If LICENSEE [Contraves] has not paid to LICENSORS under Articles 4.1 and 4.2 of this Agreement* a total amount of ONE HUNDRED THOUSAND U.S. DOLLARS ($100,000) by three (3) days after the end of every License Year for sales during that License Year, excluding the First License Year for which LICENSEE is only required to make a minimum payment of SEVENTY–FIVE THOUSAND U.S. DOLLARS ($75,000) by three (3) days after the end of the first License Year for sales during the first License Year, *this Agreement may be terminated by LICENSORS* and INVENTOR *provided, however, LICENSEE may, at its option, pay the difference* between its actual payments and ONE HUNDRED THOUSAND U.S. DOLLARS ($100,000), or SEVENTY FIVE THOUSAND U.S. DOLLARS ($75,000) for the first License Year, within three (3) days from the end of the License Year in question of this Agreement *in which case this Agreement shall continue in full force and effect in accordance with its terms.* LICENSORS and INVENTOR may, pursuant to a writing signed by the President of TRC, waive the requirement that LICENSEE shall have paid ONE HUNDRED THOUSAND U.S. DOLLARS ($100,000) within three (3) days from the end of the License Year in question, or SEVENTY FIVE THOUSAND U.S. DOLLARS ($75,000) within three (3) days from the end of the first License Year, and allow LICENSEE to continue under this Agreement under alternative arrangements if LICENSEE so agrees. Such minimum payment of ONE HUNDRED THOUSAND U.S. DOLLARS ($100,000) within three (3) days from the end of the License Year in question, or SEVENTY FIVE THOUSAND U.S.

DOLLARS ($75,000) within three (3) days from the end of the first License Year, by LICENSEE shall constitute diligent and active, development of the Products by LICENSEE such that public utilization shall result therefrom during License Years one (1) through seven (7) of this Agreement and shall fully satisfy any obligation of LICENSEE to diligently and actively develop, market, or sell the Products.

(License Agreement, 10/31/97 (Exhibit A to Complaint) (hereinafter, "License Agreement"), at 14 (emphasis added).) The parties do not dispute that this agreement is unambiguous; rather, they ascribe to it different meanings.

¶ 7 Contraves argues that it had the option *whether* to pay the minimum royalty payments, and that payment was only required to avoid termination *if* Licensors sought termination for Contraves' failure to pay. (Brief for Appellees, at 16–17.) Conversely, Licensors argue that the minimum payments were mandatory, and that the only option Contraves had was whether to "revive" the agreement if Licensors sought termination. (Brief for Appellants as Appellees in Appeal No. 833 WDA 2001, at 9.) While the trial court essentially agreed with Licensors, we find this interpretation untenable and the trial court's conclusion to be erroneous.

¶ 8 Rather, we conclude that the contract clearly states that, *if* Contraves failed to make the minimum yearly payment, Licensors *then* had the option of terminating the contract.[2] Edited for simplicity, the first clause of this provision reads: *"If*

LICENSEE has not paid to LICENSORS [the yearly minimum per unit royalty payments] this Agreement *may be terminated* by LICENSORS and INVENTOR . . . ."* (License Agreement, at 14 (emphasis added).) It is apparent to this Court that this "if-may" structure of the provision simply gives Licensors the option to terminate the contract if insufficient payments are made by Contraves and is not a mandate of minimum payments by Contraves.

¶ 9 This provision continues: "provided, however, LICENSEE *may, at its option*, pay the difference between its actual payments and [the minimum royalty payments] in which case this Agreement shall continue in full force and effect in accordance with its terms." (*Id.* (emphasis added).) Thus, *had Licensors sought to terminate the contract* for Contraves' failure to pay, Contraves *then* had the option to avoid termination by making the minimum payment. We see no other interpretation that makes sense of the "if-may-provided" structure of this provision.

¶ 10 Licensors' argument that Contraves was required to make the minimum payments and only had the option to "revive" the agreement once Licensors had terminated it is nonsensical, as unless Contraves failed to make the minimum payment, Licensors had no right to terminate: *"If* LICENSEE has not paid to LICENSORS . . ."* then "this Agreement *may be terminated* by" Licensors. (*Id.* (emphasis added).) Both Licensors and the trial court ignore the plain language of this provision.[3]

---

2. It is undisputed that Licensors never sought to terminate the agreement.

3. The trial court's interpretation is as follows: Essentially, [Contraves] claimed that under the contract at issue, which was a licensing agreement, [Contraves] had the option to

pay or not pay the annual licensing fee. The Court denied [Contraves'] Motion for Summary Judgment and ruled that the "option" meant by the clear and unambiguous language of the relevant clause was an option to pay either a certain dollar amount or that amount less a credit for any "per

¶ 11 Therefore, given the plain, unambiguous language of the contract, we conclude Contraves was not required to make the contested minimum yearly royalty payments. Accordingly, we reverse the grant of summary judgment in favor of Licensors for $251,687.84 and remand this matter with instructions that the trial court enter judgment in favor of Contraves on this point.

 ¶ 12 In their cross-appeal, Licensors argue that the trial court erred in denying their claim for counsel fees against Contraves. Licensors cite to article 7 of the license agreement which provides that Contraves must indemnify Licensors for, *inter alia*, counsel fees "arising from any obligation of LICENSEE" under the agreement. (Agreement, at 19–20; *see also* Brief for Appellants, at 17 n. 3, 20–21.)

¶ 13 Given Judge Friedman's conclusion that Contraves had an obligation to pay Licensors approximately $251,000 in minimum royalty payments under article 4.3.1 of the agreement, this case went to trial before Judge Baer to determine, *inter alia*, whether article 7 supported an award of counsel fees "arising from [the] obligation" of Contraves to make the minimum royalty payments. Judge Baer ultimately concluded that Licensors were not entitled to recover these counsel fees. Regardless, we need not address the propriety of this conclusion. As we have determined that the trial court erroneously held that Contraves was obligated to pay any minimum royalty payments, Contraves had no obligation "arising from" the agreement; thus

under Licensors' argument, article 7 is not triggered. Accordingly, on this alternate ground, we affirm the trial court's denial of counsel fees. *See Shearer v. Naftzinger,* 560 Pa. 634, 638, 747 A.2d 859, 861 (2000) (noting that a lower court may be affirmed on any basis).

¶ 14 Judgment reversed in part and affirmed in part. Case remanded with instructions. Jurisdiction relinquished.

---

unit royalty fees" that [Contraves] had already paid [Licensor] for each of the first three years of the twenty-year licensing agreement.
(Trial Court Opinion, 5/31/01, at 2 n. 1.) We agree with Contraves that this interpretation of the contract is unreasonable: it apparently implies that, for example, in year two when

Contraves made a royalty payment of approximately $38,000, that Contraves then had the "option" of paying $100,000 (the minimum payment), *or* $62,000 (the difference between the minimum payment and the actual royalty payments). We cannot accept this unreasonable interpretation.